REX A. WOOLLEN, APPELLEE AND CROSS-APPELLANT, V.
THE STATE OF NEBRASKA, APPELLANT AND CROSS-APPELLEE.

593 N.W.2d 729

Filed May 7, 1999. No. S-98-127.

Don Stenberg, Attorney General, and Hobert B. Rupe for appellant.

Siegfried H. Brauer for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, MCCORMACK, and MILLER-LERMAN, JJ.

MILLER-LERMAN, J.

## I. NATURE OF CASE

The State of Nebraska appeals from a judgment entered following a bench trial finding the State liable to Rex Woollen, appellee, under the State Tort Claims Act (Act), Neb. Rev. Stat. § 81-8,209 et seq. (Reissue 1987 & Cum. Supp. 1992), for damages Woollen sustained in a one-car accident on Highway 136 in Johnson County, Nebraska. Woollen cross-appeals, challenging the trial court's conclusion that he was responsible for 40 percent of the negligence that proximately caused the accident, various findings with respect to items of damages, and an evidentiary ruling.

With respect to the State's appeal, we affirm the trial court's finding as to the comparative negligence of the parties. With respect to the cross-appeal, we conclude the trial court erred in striking Woollen's damage claim for legal expenses he paid in proceedings prior to the trial herein that concerned medical bills incurred for the treatment of injuries he sustained in the accident. We reverse, and remand for a new trial in the trial court limited to Woollen's claim for damages in the instant action due to legal expenses incurred in these other prior proceedings, and if such damages are established, they are to be reduced by Woollen's percentage of negligence. We conclude the remainder of the assigned errors in Woollen's cross-appeal are without merit.

## II. STATEMENT OF FACTS

### 1. ACCIDENT

On February 14, 1992, at approximately 4:50 p.m., Woollen was driving his 1985 Buick Skylark west on Highway 136 in

Johnson County when he was involved in a one-car accident. Woollen, a 53-year-old farmer, was alone in his vehicle. There was still daylight, and the temperature was approximately 45 degrees Fahrenheit. At the time of the accident, rain had been falling steadily for some time.

The surface of Highway 136 was deeply rutted, and as Woollen drove he tried to keep his car's tires on the ridges separating the ruts, for better control. Woollen was not familiar with the road conditions on Highway 136. He testified that he had driven on Highway 136 about five times in the 4 years preceding his accident but that he had never driven on Highway 136 in the vicinity of the accident in rainy or otherwise wet conditions.

Driving on the rutted surface, Woollen's car hit a pool of water that had "ponded" over the ruts and covered the entire width of the highway at the bottom of a low-grade slope. Woollen's car hydroplaned, and he lost control of it. The car veered diagonally across the highway, crossing the lane for oncoming traffic before leaving the road and striking a concrete culvert headwall located approximately 12 feet from the edge of the south side of the highway. As a result of the impact, Woollen's car flipped and rolled, and Woollen was ejected from it and sustained injuries.

Woollen sued the State for various damages under the Act. Woollen alleged, inter alia, that the State negligently failed to safely maintain the highway and negligently failed to warn motorists of the hazardous conditions at the accident site. Woollen's claim for damages for legal expenses incurred in prior proceedings brought to collect medical fees incurred for treatment of injuries he sustained in the accident were stricken before trial. Woollen filed his petition against the State in the district court for Johnson County on November 28, 1994.

### 2. CONDITION OF HIGHWAY 136 BEFORE ACCIDENT

#### (a) Road Ruts

When Woollen's accident occurred in February 1992, the surface of Highway 136 at the accident site was covered with asphaltic pavement. Over time, traffic had formed ruts on the highway's surface. In the westbound lane in which Woollen was

traveling prior to the accident, the depth of the ruts was from one-half inch to over an inch. Trial evidence showed that some ruts were deeper than three-fourths of an inch at the point at which Woollen's car began to hydroplane. As a result of the highway's downward slope and steady rainfall on the day of the accident, water had filled and flowed out of the ruts, forming a pool across the highway. It was at this pool of water that Woollen lost control of his car when it began hydroplaning.

Fact witness Roger Batterscher testified that shortly before the accident, Woollen's car passed Batterscher's car after Batterscher had reduced his speed from 50 m.p.h to approximately 40 m.p.h. because of the highway ruts and the pooling water. Batterscher testified that in his experience, the road's rutted surface made it unsafe to drive at the 55-m.p.h. posted speed limit when the road was wet. The existence and depth of the ruts in the vicinity of the accident were not seriously disputed at trial.

In 1972 and 1973, the State resurfaced Highway 136 at the accident location, applying a new asphaltic surface. No other changes were made to the highway or to the culvert and headwall.

In 1989, the State Department of Roads commenced the "Rehabilitation, Restoration and Reconstruction Project," which came to be known as the 3R Project, for Highway 136 at and near the accident site. As part of the 3R Project, the State extensively studied the highway's condition, and thus, the State was aware prior to Woollen's accident of the highway's slope, its deep surface ruts, and other automobile accidents caused by hydroplaning which had occurred in the approximate location of Woollen's accident.

In 1971 and again in 1991, the State adopted highway design and maintenance standards which specifically addressed, inter alia, the safety risks posed by ruts in road surfaces and the proper situation of culverts in relation to the edges of roadways. The trial court accepted evidence of these and other related standards, including exhibit 18, "Minimum Design Standards"; exhibit 74, "Pavement Management System"; exhibit 75, "Manual on Uniform Traffic Control Devices"; exhibit 232, the State's 1988 supplement to the manual found at exhibit 75; and

exhibit 233, "Standards and Guides for Traffic Controls for Street and Highway Construction, Maintenance, Utility, and Incident Management Operations," published by the Federal Highway Administration. Documents entitled "Nebraska Highway Needs Study" for the years 1988 to 1990 were received as exhibits 86 through 88. For convenience, we refer to these exhibits collectively as "the safety standards." According to the safety standards, ruts three-fourths of an inch deep posed an unacceptable safety risk. Woollen's expert witness, William Berg, also so testified.

### (b) Situation of Culvert and Headwall

Highway 136 was designed and originally constructed in 1955. The culvert and concrete headwall into which Woollen's car collided were installed during the highway's original construction. The culvert is a steel pipe, 48 feet long and 72 inches in diameter. The concrete headwall for the culvert was situated approximately 12 feet from the southernmost edge of the highway's paved surface. At the time this portion of Highway 136 was built, no standardized design safety guidelines had been adopted by the State to govern placement of the culvert and headwall in relation to the edge of the roadway. There was no evidence that the original design and construction of Highway 136 were negligent.

The safety standards introduced into evidence at trial addressed proper situation and "clear zone" dimensions for obstacles or structures located off the paved highway surfaces, such as the culvert and headwall into which Woollen's car collided. At all relevant times in the case at bar, the lateral clear zone at the accident site from the southern edge of Highway 136 to the culvert and headwall was 12 feet. According to the safety standards, lateral clearance of at least 20 feet from the pavement edge should be allowed when the average daily traffic (ADT) on a road is between 400 and 480 cars. In 1972 and 1973, when Highway 136 was resurfaced, the ADT was 570 cars, and it was projected that by 1992, the ADT would be 1,025 cars. The 1992 minimum design standards adopted by the State provided that for ADT between 850 and 1,700 vehicles, a 23-foot lateral clearance should be provided for any off-pavement structure.

At the time of the accident, the only warning sign near the culvert was a single post with three reflectors in a vertical configuration that marked the culvert headwall. Batterscher and Kimberly Koch, percipient witnesses to Woollen's accident, were both familiar with Highway 136 and drove it frequently. Both witnesses testified that the culvert and headwall which Woollen's car struck were not easily visible to motorists. Batterscher, a lifelong resident of the area who had driven on Highway 136 for years, testified that before Woollen's accident, he did not know that the culvert and headwall were there.

The evidence showed that the 3R Project was designed, inter alia, to correct these dangerous conditions. The State did not implement the changes recommended by the 3R Project. The State did take steps to warn motorists of the dangerous highway surface after Woollen's accident.

### 3. TRIAL OF WOOLLEN'S CLAIMS

Woollen's claims against the State were tried to the court on September 3 through 5, 1997, and the trial court's order entering judgment in favor of Woollen and against the State was filed on January 12, 1998. The judgment order was 16 pages long. In it, the trial court made extensive findings of fact and conclusions of law, relevant portions of which we set forth below.

### (a) Factual Findings and State's Duty

As noted above, witness Batterscher testified that he had previously seen water pool on Highway 136 at the accident site and Batterscher also stated that on the day of the accident, Woollen passed him on the highway shortly before Woollen lost control of his car. Woollen testified that he did not remember exactly how fast he was going before the accident and that he did not recall seeing the pool of water before he drove into it. Based on the evidence, the trial court found that 40 m.p.h. was the appropriate driving speed for the conditions existing at the time the accident occurred. The trial court further found that a driver traveling at that speed would have seen the pool of water and would reasonably have been able to slow his or her vehicle before entering the pool. The trial court found that Woollen did not decrease his speed prior to driving into the pool of water where the hydroplaning started.

The trial court found that the ruts at and in the vicinity of the accident site rendered the surface of Highway 136 dangerous to motorists, especially during periods of rain and water accumulation. The trial court found that the State had actual notice of the ruts' depth and that according to the State's safety standards, the ruts posed an unacceptable safety risk, but that the State did not repair the ruts as it had a duty to do. The trial court found that the State knew of previous accidents at the location in question.

The trial court concluded that at the time of the accident, the State had no duty to rebuild the culvert and headwall, as there was no evidence that they had been negligently designed and constructed in 1955. However, based upon the minimum design and safety standards adopted by the State and introduced into evidence that showed the culvert and its headwall to be in a "danger area," the trial court concluded that the State had a duty to warn motorists of the hazard posed by the inadequate clear zone between the paved road's edge and the culvert and headwall and of the corresponding need for motorists to travel at a reduced rate of speed, or to construct guardrails or crash cushions to lessen the possibility of a collision with the culvert's headwall.

### (b) Determinations Regarding Negligence

Given the foregoing findings of fact and conclusions regarding the State's duty, the trial court held that the State was negligent "in two respects." First, the trial court determined that the State failed to maintain the surface of Highway 136 in the vicinity of the accident and that this negligence facilitated the pooling of water, which created a hazard to drivers. Second, the trial court determined that the State was negligent in failing to warn drivers of the existence of the headwall or to take appropriate action with respect to the location of the headwall of the culvert to minimize the danger posed by the culvert headwall.

The trial court found that Woollen was contributorily negligent in failing to maintain an adequate lookout, in failing to maintain control of his vehicle, and in traveling at an unsafe rate of speed.

The trial court found that Woollen was responsible for 40 percent of the negligence that proximately caused the accident and that the State was responsible for the remaining 60 percent. The trial court apportioned liability for the accident's occurrence and Woollen's resultant damages according to these percentages.

### (c) Damages Awarded to Woollen

Woollen sought damages for his past and future medical expenses; past, present, and future pain and suffering; lost earnings and loss of earning capacity; and loss of his vehicle. Woollen also claimed that he had incurred legal expenses defending against claims filed against him by health care providers seeking payment for care provided to Woollen as a result of the accident. In response to the State's motion, the trial court struck Woollen's claim for damages for the attorney fees Woollen incurred in prior proceedings brought by health care providers seeking payment.

Following trial, the trial court found that as a result of the accident, Woollen sustained a total of $881,373.24 in damages, as follows: $145,373.24 in medical expenses, to date of trial; $50,000 in future medical expenses; $100,000 for Woollen's disability to date; $400,000 for Woollen's future disability; $100,000 for Woollen's pain and suffering to date; $50,000 for Woollen's future pain and suffering; $6,000 for Woollen's lost income to date of trial; and $30,000 for Woollen's loss of future earning capacity.

Based upon the court's determination concerning the respective negligence of the parties, judgment was entered against the State in the amount of $528,823.94, plus interest and costs. The trial court determined that Woollen had produced insufficient evidence to justify an award of damages for lost past or future income based upon Woollen's farming operation, although the trial court found that Woollen had proved an annual expense of $1,500 for an agronomist, which expense he had not been forced to incur prior to the accident. The trial court also determined that Woollen had offered insufficient evidence to merit an award of damages for the loss of his vehicle.

The State appeals, and Woollen cross-appeals.

## III. ASSIGNMENTS OF ERROR

### 1. Appeal

The State claims on appeal that the trial court erred in (1) failing to find the State immune from Woollen's claims under § 81-8,219(10) of the Act; (2) determining that the 12-foot clear zone for the roadside culvert struck by Woollen violated State policies; (3) finding the State had a duty to warn motorists of the culvert or to take other action such as installing guardrails or a crash cushion to make the location safer; and (4) failing to find that the State's negligence was not outweighed by Woollen's negligence.

### 2. Cross-Appeal

Woollen cross-appeals, claiming that the trial court erred in (1) striking Woollen's claim for damages for legal fees incurred to defend against actions seeking to collect for health care services provided to Woollen as a result of his injuries from the accident, (2) failing to award Woollen damages for his lost vehicle, (3) failing to award Woollen damages for his loss of earning capacity, (4) determining that Woollen was negligent, (5) determining that Woollen's negligence proximately caused his damages, and (6) allowing the State's expert witness, Dean L. Sicking, to testify on the issue of causation.

## IV. STANDARD OF REVIEW

In actions brought under the Act, findings of fact made by the trial court will not be set aside unless such findings are clearly incorrect. *Maresh v. State*, 241 Neb. 496, 489 N.W.2d 298 (1992).

Where the facts of a case brought pursuant to the Act are undisputed, the issue of whether liability is precluded by sovereign immunity is a question of law in which an appellate court reaches a conclusion independent of the lower court's ruling. See, *D.K. Buskirk & Sons v. State*, 252 Neb. 84, 560 N.W.2d 462 (1997); *Lemke v. Metropolitan Utilities Dist.*, 243 Neb. 633, 502 N.W.2d 80 (1993).

In proceedings where the Nebraska Rules of Evidence apply, the admission of evidence is controlled by rule and not by judicial discretion, except where judicial discretion is a factor

involved in assessing admissibility. *Talle v. Nebraska Dept. of Soc. Servs.*, 253 Neb. 823, 572 N.W.2d 790 (1998). Admission of expert witness testimony is ordinarily within the discretion of the trial court, and its ruling will be upheld in the absence of an abuse of discretion. *Childers v. Phelps County*, 252 Neb. 945, 568 N.W.2d 463 (1997).

The amount of damages awarded in a case pursuant to the Act is a matter solely for the finder of fact, whose action in this respect will not be disturbed on appeal if it is supported by evidence and bears a reasonable relationship to the elements of damages proved at trial. *Talle, supra.*

## V. ANALYSIS

### 1. STATE'S DIRECT APPEAL

#### (a) Sovereign Immunity

The State claims on appeal that given the evidence at trial, the trial court erred in failing to conclude that the State was immune from Woollen's claims. Neb. Const. art. V, § 22, provides, "The State may sue and be sued, and the Legislature shall provide by law in what manner and in what courts suits shall be brought." This provision of the Constitution is not self-executing, and legislative action is necessary to waive the State's sovereign immunity. *Hoiengs v. County of Adams*, 245 Neb. 877, 516 N.W.2d 223 (1994), *appeal after remand* 254 Neb. 64, 574 N.W.2d 498 (1998), *cert. denied* ___ U.S. ___, 119 S. Ct. 339, 142 L. Ed. 2d 280 (1998); *Concerned Citizens v. Department of Environ. Contr.*, 244 Neb. 152, 505 N.W.2d 654 (1993). It is axiomatic that a waiver of sovereign immunity is found only where stated by the most express language of a statute or by such overwhelming implication therefrom as will allow no other reasonable construction. *Hoiengs, supra.* Statutes that purport to waive the State's sovereign immunity must be clear in their intent. They are strictly construed in favor of the sovereign and against the waiver. *Wiseman v. Keller*, 218 Neb. 717, 358 N.W.2d 768 (1984).

In support of its claim of immunity, the State relies upon § 81-8,219(10), which the State refers to as the "snow and ice" exception to the Act. The Act generally provides that the State

is liable for torts in the same manner and to the same extent as a private entity. § 81-8,215. However, § 81-8,219 sets forth particular claims for which the State has not waived immunity. Section 81-8,219 was amended effective February 8, 1992, subject to an emergency clause. At the time of the accident, § 81-8,219 provided:

The State Tort Claims Act shall not apply to:

. . . .

(10) Any claim arising out of snow or ice conditions or other temporary conditions caused by nature on any highway as defined in section 30-602, bridge, public thoroughfare, or other state-owned public place due to weather conditions. Nothing in this subdivision shall be construed to limit the state's liability for any claim arising out of the operation of a motor vehicle by an employee of the state while acting within the course and scope of his or her employment by the state.

Although not relied upon by the parties, we note that § 81-8,219 further provided:

The State Tort Claims Act shall not apply to:

. . . .

(12) Any claim arising out of the alleged insufficiency or want of repair of any highway as defined in section 39-602, bridge, or other public thoroughfare. Insufficiency or want of repair shall be construed to refer to the general or overall condition and shall not refer to a spot or localized defect. The state shall be deemed to waive its immunity for a claim due to a spot or localized defect only if the state has had actual or constructive notice of the defect within a reasonable time to allow repair prior to the incident giving rise to the claim.

The State argues that the evidence shows that the rain falling on February 14, 1992, created a pool of water which was a " 'temporary condition caused by nature,' " brief for appellant at 14, and that it was this condition which caused Woollen's accident. The State claims it is immune from liability pursuant to § 81-8,219(10) because the evidence shows that this accident was caused by "temporary conditions caused by nature . . . due to weather conditions." We do not agree.

The State raised the immunity issue as an affirmative defense to Woollen's petition. As such, the burden of proving it rested upon the State. See *Maresh v. State*, 241 Neb. 496, 489 N.W.2d 298 (1992). Thus, the immunity issue must be evaluated on appeal in light of the proof introduced at trial.

The evidence at trial showed and the trial court found that the road surface at the location where Woollen lost control of his car was marred by ruts of three-fourths of an inch or greater depth. The trial court found that the State had actual knowledge of the road's rutted condition before Woollen's accident and that there had been prior accidents at this location. In this regard, the trial court specifically noted that as a result of the State's 3R Project study of the road which began in 1989, the State had actual knowledge of hydroplaning accidents at the same location where Woollen lost control of his car. The evidence also showed that the State knew that the ruts created an unacceptable risk or danger that violated the State's own safety standards, yet the State did not repair the ruts, post a warning, or use other means to alert motorists of the danger caused by the ruts. The trial court determined that because of the ruts at this location, rainwater pooled at the base of a slight slope in the road instead of draining off the road, and that the pooled water increased the underlying dangerous condition of the road caused by the ruts.

Based on these facts, the trial court found that the underlying rutted condition of the road at the location of the accident, and not the weather on February 14, 1992, was a proximate cause of Woollen's loss of control of his vehicle and ensuing collision into the culvert headwall, that is, the ruts on the road were a condition created over time which caused Woollen's accident, and his accident was not due to a temporary condition caused by nature due to the weather. The trial court's findings are supported by evidence in the record, and we cannot say that they are clearly incorrect.

The State directs us to *Hammond v. Nemaha Cty.*, 7 Neb. App. 124, 581 N.W.2d 82 (1998), in support of its claim that it was immune from suit. *Hammond* is distinguishable. In *Hammond*, the Nebraska Court of Appeals, applying § 81-8,219(10), concluded that the State was immune from a suit for damages arising from a motorcycle accident on a rain-slickened, gravel

detour road on which the passenger plaintiff claimed the State had failed to post warnings. The Court of Appeals noted in *Hammond* that the evidence showed that the slickened condition of the road was obvious and that the motorcyclist, an experienced rider, had actual knowledge that the road surface was slick but, nevertheless, continued along the roadway. In *Hammond*, there was no evidence of negligent or defective maintenance of the road upon which the accident occurred. The Court of Appeals concluded that warnings about the conditions, of which the motorcyclist was aware and which were obvious, were not necessary. *Hammond* is inapposite to our analysis of the facts of the instant case.

In the case at bar, it is undisputed that through use and the passage of time Highway 136 was deeply rutted at the spot at which Woollen's car began to hydroplane. The trial court concluded and we agree as a matter of law that under § 81-8,219(10), the State was not immune from suit, because the defective condition of the highway, rather than a temporary condition caused by nature due to weather conditions, caused the accident. This conclusion is consistent with other portions of the Act, which we read in pari materia, see *Willers v. Willers*, 255 Neb. 769, 587 N.W.2d 390 (1998), and, in particular with § 81-8,219(12), which provides that with respect to roadways, "[t]he state shall be deemed to waive its immunity for a claim due to a spot or localized defect only if the state has had actual or constructive notice of the defect within a reasonable time to allow repair prior to the incident giving rise to the claim." In the instant case, the State knew that the ruts at the location of the accident constituted an unacceptable safety risk in violation of the State's highway safety standards and that accidents had occurred at this location, but the State nonetheless failed to act to alleviate the hazard caused by the ruts or to warn motorists of the danger the ruts created. The trial court determined that the ruts were the underlying cause of Woollen's accident, separate and independent from the rain that was falling at the time Woollen lost control of his car and as such, that the ruts were a proximate cause of Woollen's accident and injuries. On this record, we conclude the trial court's findings are not clearly incorrect, and based on our independent review of the law, we

affirm the trial court's conclusion that the State was not immune from suit on the basis of the "snow and ice" exception to liability contained in § 81-8,219(10).

#### (b) Trial Court Findings of State's Negligence

The trial court found that the State was negligent in two respects: (1) The State failed to properly maintain the highway surface, which resulted in the accumulation of a pool of water that constituted a hazard to motorists, and (2) the State failed to warn motorists or take other appropriate action to minimize the danger of the culvert headwall, given its presence in what should have been an unimpeded clear zone. The trial court determined the State's failure to maintain the road and failure to warn of the location of the headwall or to take steps to minimize the danger of the headwall proximately caused Woollen's injury. On appeal, the State claims that the trial court erroneously mandated an onerous " 'state of the art' " standard for all state roads. Brief for appellant at 21. The State's argument is without merit.

The section of Highway 136 upon which the accident occurred was constructed in 1955, when no standardized or official safety criteria governed the road design at issue. The trial court correctly found that the State was immune from liability for the design of the road, but that Woollen's claim against the State for negligent maintenance of the road was actionable and supported by the trial evidence. In *Maresh v. State*, 241 Neb. 496, 518, 489 N.W.2d 298, 314 (1992), we stated that "design is not actionable, as it involves discretionary decisions, but maintenance is actionable, as it does not."

The holding quoted above in *Maresh* was relied upon in *Lemke v. Metropolitan Utilities District*, 243 Neb. 633, 502 N.W.2d 80 (1993), where we held that when (1) a governmental entity has actual or constructive notice of a dangerous condition or hazard caused by or under the control of the governmental entity and (2) the dangerous condition or hazard is not readily apparent to persons who are likely to be injured by it, the governmental entity has a nondiscretionary duty to warn of the danger or take other protective measures that may prevent injury as the result of the dangerous condition or hazard. In *Lemke*, the defendant, a governmental entity which provided

natural gas and associated products and services, was held liable for the plaintiff's catastrophic injuries resulting from leaking gas hoses which the defendant knew were defective and dangerous, but about which the defendant had issued no warning to alert others of the danger posed by the hoses nor taken steps to minimize the danger.

The State's liability for failure to maintain highways is the same as the comparable liability of counties. *Maresh, supra.* See § 81-8,219(12). Thus, to the extent applicable, we rely on cases involving alleged failure by political subdivisions to maintain highways.

In the case at bar, in order to establish the State's negligence, Woollen had to prove "the four basic elements of negligence, namely, duty, breach of duty, proximate causation, and damages." *Scholl v. County of Boone*, 250 Neb. 283, 289, 549 N.W.2d 144, 148 (1996). We analyze these elements below.

*(i) Foreseeability and State's Duty to Woollen*
We have noted:

" ' " ' 'Duty' is a question of whether the defendant is under any obligation for the benefit of the particular plaintiff; and in negligence cases, the duty is always the same— to conform to the legal standard of reasonable conduct in the light of the apparent risk. . . .

" ' ' "A duty, in negligence cases, may be defined as an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another." Prosser and Keeton on the Law of Torts, *Limited Duty* § 53 at 356 (5th ed. 1984).

" ' Foreseeability is a factor in establishing a defendant's duty, or, as expressed by Justice Cardozo in *MacPherson v. Buick Motor Co.*, 217 N.Y. 382, 394, 111 N.E. 1050, 1054 (1916): "[F]oresight of the consequences involves the creation of a duty[.]" . . .' "

*Lemke*, 243 Neb. at 648-49, 502 N.W.2d at 90, quoting *Union Pacific RR. Co. v. Kaiser Ag. Chem. Co.*, 229 Neb. 160, 425 N.W.2d 872 (1988). See, similarly, *Popple v. Rose*, 254 Neb. 1, 573 N.W.2d 765 (1998). Whether a legal duty exists for actionable negligence is a question of law dependent on the facts of a

particular case. *Id.*; *Schmidt v. Omaha Pub. Power Dist.*, 245 Neb. 776, 515 N.W.2d 756 (1994); *Lemke, supra.*

For Woollen to recover, it was necessary that Woollen establish that the State could have foreseen the general manner in which the injury or loss occurred. The record on appeal amply demonstrates " ' "[f]oresight of the consequences," ' " *Lemke,* 243 Neb. at 649, 502 N.W.2d at 90, sufficient to create a duty for the State to repair the deep ruts, i.e., a localized defect, and to warn of or minimize the dangers created by the inadequate clear zone between the edge of the highway pavement and the culvert headwall.

With respect to the ruts, the State's foresight arose as a result of, inter alia, its promulgation of safety standards, multiple and varied examinations of Highway 136 which confirmed its unacceptable noncompliance with State safety standards at the accident site, and the State's actual knowledge of other automobile accidents, including those caused by hydroplaning, which occurred at the same location where Woollen lost control of his car.

With respect to the concrete headwall, the State's foresight arose primarily from the evidence establishing the State's adoption of the safety standard's clear zones. The record contains evidence that a factor to be considered in analyzing the State's duty to repair and maintain a roadway is the existence of an adequate clear zone. A clear zone is an area beyond the roadway within which a fixed object, such as a utility pole or culvert headwall, is considered a hazard to vehicles. According to the evidence, when a hazard is identified in a clear zone, the State ordinarily has three alternatives: remove the hazard, relocate the hazard beyond the clear zone, or shield motorists from the hazard, customarily by using a guardrail. According to the evidence, once a clear zone is identified, it should be maintained clear of hazards because conduct of drivers, including misconduct of drivers, causing vehicles to leave the roadway is anticipated. The concept of a "forgiving highway" has been developed to allow for driver error, including a driver's leaving the roadway and traveling off the shoulder or into the median. *Goodermote v. State*, 856 S.W.2d 715 (Tenn. App. 1993). See, also, *Martin v. Missouri Highway and Transp.*, 981 S.W.2d 577

(Mo. App. 1998). The safety standards in evidence in this case provide for a clear zone in the area of the accident because it is foreseeable that drivers will leave the roadway and an unimpeded clear zone reduces injuries. Thus, the trial court concluded, the State had a duty to adhere to its clear zone standards by warning of or minimizing the danger of the concrete headwall.

We conclude, as did the trial court, that the likelihood of an automobile accident at this location was foreseeable, thus creating a duty for the State to repair the deep ruts and to warn or minimize the dangers to motorists of the hazards precipitated by the narrow clear zone. See *Maresh v. State*, 241 Neb. 496, 489 N.W.2d 298 (1992).

### (ii) State's Breach of Duty

A governmental entity's actual or constructive knowledge of a hazard or dangerous condition coupled with the entity's failure to follow governing statutes, policies, or rules that mandate warning of or correction of the hazard may, in a proper case, provide evidence of the entity's duty to a plaintiff and breach of that duty. For example, in *Millman v. County of Butler*, 244 Neb. 125, 504 N.W.2d 820 (1993), we held that a county was properly adjudged liable for negligently failing to maintain a bridge and warn of this danger where the bridge, like the highway in the case at bar, was built before safety criteria existed to govern the bridge's design and construction. The actionable negligence in *Millman* was not the bridge's design, but the county's actual knowledge of the bridge's unsafe condition and failure to warn motorists of the danger, in light of the facts that the county knew as the result of three prior inspections that the bridge was dangerous and did not meet the county's safety specifications and that the evidence indicated that a warning would have induced caution by drivers.

A similar analysis was applied in *Maresh, supra*, wherein this court concluded that the State negligently breached its duty to the plaintiff by, inter alia, the State's failure to follow its own safety standards in marking the edges of a highway made dangerous by construction. On appeal, we agreed with the *Maresh* trial court that the State's violation of its safety standards was evidence of negligence and stated:

> The State's failure to comply with its own manual as to channelizing device[s], edge markers, or placement of the object markers "in line with the edge of the obstruction," in light of the circumstances presented in this case, is sufficient evidence of breach of duty that it cannot be said the district court was clearly incorrect.

241 Neb. at 513, 489 N.W.2d at 311. See, also, *Oldenburg v. State*, 221 Neb. 1, 374 N.W.2d 341 (1985) (holding that State knew or should have known that its negligent failure to repair road rut in violation of safety standards rendered plaintiff's automobile accident reasonably foreseeable, thereby giving rise to duty by State and breach thereof). We agree with the trial court that the State breached its duty both as to the ruts in the roadway and as to the concrete headwall.

### (iii) Proximate Cause

Determination of causation is ordinarily a matter for the trier of fact. *Maresh, supra.* See, also, *Tapp v. Blackmore Ranch*, 254 Neb. 40, 575 N.W.2d 341 (1998); *Stewart v. City of Omaha*, 242 Neb. 240, 494 N.W.2d 130 (1993). It is well established that a cause of an injury may be a proximate cause, notwithstanding that it acted through successive instruments of a series of events, if the instruments or events were combined in one continuous chain through which the force of the cause operated to produce the disaster. *Rose v. Buffalo Air Service*, 170 Neb. 806, 104 N.W.2d 431 (1960); *Kroeger v. Safranek*, 161 Neb. 182, 72 N.W.2d 831 (1955). In the instant case, the evidence shows that Woollen was traveling too fast for conditions, failed to maintain control of his vehicle, and failed to keep a lookout. The State failed to maintain a roadway that became rutted, posing a danger; the State failed to minimize the danger posed by the headwall in the clear zone; and Woollen's injuries were made more severe by collision into the concrete headwall. Each of these negligent acts combined to cause Woollen's injuries. The test of causation is not that the particular injury could be anticipated, but whether, after the occurrence, the injury appears to be the reasonable and probable consequence of the acts or omissions. *Oldaker v. Peters*, 869 S.W.2d 94 (Mo. App. 1993). See *Libbey-Owens Ford Glass Co. v. L & M Paper Co.*, 189 Neb. 792, 801, 205 N.W.2d 523, 529 (1973) (stating that "[t]he law does not

require precision in foreseeing the exact hazard or consequence which happens. It is sufficient if what occurs is one of the kind of consequences which might reasonably be foreseen").

Although we agree with the trial court that the State breached its duty as to the ruts and failed to minimize the impact with the concrete headwall in the clear zone and that these breaches proximately caused the accident, under the circumstances of this case, the trial court's alternative determination with respect to the clear zone, that is, that the State's breach of its duty to warn drivers of the condition of the clear zone was a proximate cause, is clearly incorrect. Our review of the record shows that under the facts of this case, a warning by the State logically placed in the area approaching the location where Woollen's vehicle left the pavement would not have been effective, because although such warning would have alerted oncoming eastbound traffic as to the clear-zone conditions south of the pavement's southern edge, such warning would not have been visible to Woollen as he approached the location of the accident moving in a westerly direction. Thus, the trial judge's alternate finding of fact that the State's failure to warn proximately caused the accident is clearly incorrect. This determination does not require reversal, however, if the remaining evidence supports the trial court's decision regarding the comparative negligence of the parties. See, *Gatewood v. City of Bellevue*, 232 Neb. 525, 441 N.W.2d 585 (1989) (holding that where evidence is in conflict, issues of comparative and contributory negligence are questions of fact, wherein trial court's findings will not be set aside unless clearly wrong or unsupported by evidence); *Phillips v. City of Omaha*, 227 Neb. 233, 417 N.W.2d 12 (1987).

In an action under the Act, determination of whether the plaintiff's contributory negligence exceeds the negligence of the State requires findings of fact by the trial court, which we will not disturb on appeal unless such findings are clearly incorrect. See, e.g., *Maresh v. State*, 241 Neb. 496, 489 N.W.2d 298 (1992). Compare *Oldenburg v. State*, 221 Neb. 1, 374 N.W.2d 341 (1985) (holding under former gross/slight negligence statutes that plaintiff who was more than slightly contributorily negligent was barred from recovery, despite State's negligence,

which was less than gross). We have stated, "In Nebraska, a defendant's negligence is not actionable unless it is a proximate cause of the plaintiff's injuries or is a cause that proximately contributed to them." *Sacco v. Carothers*, 253 Neb. 9, 17, 567 N.W.2d 299, 305 (1997). Thus, for a plaintiff to succeed in an action based on negligence, the evidence must show that there is some reasonable connection between the negligent act or acts of defendant and the damage suffered by the plaintiff. *Id.* See W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 41 (5th ed. 1984). In the instant case, Woollen's evidence established proximate cause as a result of the State's breach of its duties to repair the ruts and to minimize the danger of impact with the headwall in the clear zone. The State's liability predicated on these acts of negligence was amply established.

As detailed more fully elsewhere in this opinion, the facts established that Woollen was traveling in excess of a safe speed for the existing conditions, failed to keep control of his vehicle, and failed to keep a proper lookout. The circumstances of this case support the trial court's determination that Woollen was 40-percent negligent. Thus, the trial court's attribution of 60-percent negligence to the State is correct. On this record, we affirm the trial court's findings that the State's negligence with respect to the ruts and the condition of the headwall in the clear zone were proximate causes of Woollen's injury and that the State's negligence exceeded Woollen's contributory negligence.

We are not persuaded by the State's argument that because the trial court found Woollen responsible for 40 percent of the negligence which caused his injuries, the State must be absolved of all liability for its negligence. Even given Woollen's contributory negligence, the trial court did not err in finding negligence on the part of the State which was a proximate cause of the accident. See, similarly, *Maresh, supra.* Under current comparative negligence principles, see Neb. Rev. Stat. § 25-21,185 et seq. (Reissue 1995), a plaintiff's contributory negligence as a contributing proximate cause of an accident may but does not necessarily discharge the other tort-feasor or tort-feasors, including the State, of liability for damages resulting from its or their negligence.

The State contends that the trial court's order imposing liability upon the State for Woollen's damages as a result of the State's negligence "seems to confer upon the State to have 'state of the art' highways, in other words that all highways must be at the cutting edge of safety design." Brief for appellant at 21. We do not agree with this characterization of the trial court's order.

We have previously stated: " 'If there is a legal duty to protect the public by warning of a danger or by taking preventing measures, or both, the choice of means may be discretionary, but the decision whether or not to do so at all is, by definition, not discretionary.' " *Lemke v. Metropolitan Utilities District*, 243 Neb. 633, 647, 502 N.W.2d 80, 89 (1993). Here, the trial court determined the liability of the State on the facts of this case; however, it did not order the State to bring the entirety of Highway 136 into compliance with the safety standards, nor did the trial court dictate the means or mode by which adequate compliance with the standards should be achieved.

It is true that a county is not an insurer of the safety of travelers on its roads. *Scholl v. County of Boone*, 250 Neb. 283, 549 N.W.2d 144 (1996). This proposition logically extends to roads and highways over which the State exercises control. Nonetheless, the State has certain duties with respect to roadways, and breaches of such duties which proximately cause injury can give rise to liability.

The trial court's findings that the State breached its duties to repair the ruts and minimize the danger of impact with the headwall and that such breaches proximately caused the injuries are supported by evidence in the record. The evidence also supports the determination that Woollen was 40-percent negligent. Accordingly, we affirm the trial court's findings and order indicating that the State was 60-percent negligent.

## 2. WOOLLEN'S CROSS-APPEAL

For his cross-appeal, Woollen has raised six assignments of error. We will address these assignments in the order raised by Woollen.

### (a) Legal Expenses in Prior Proceedings

Woollen claims the trial court erred in granting the State's motion to strike his claim for damages for legal expenses incurred by Woollen in prior proceedings brought to collect medical fees he incurred for the treatment of injuries he sustained in the accident. Because the trial court acted on a motion to strike, it heard no evidence as to the allegations in the petition for damages for attorney fees in prior proceedings, and we assume the truth of the allegations. See *Thacker v. State*, 193 Neb. 817, 229 N.W.2d 197 (1975). We conclude the trial court erred in striking this claim, and we reverse, and remand for further proceedings with respect to this item of damages.

The State observes in its brief that with regard to the recovery of attorney fees in Nebraska, the general rule is that such fees are recoverable only when provided for by statute or allowed in the uniform course of procedure. See, *Zimmerman v. FirsTier Bank*, 255 Neb. 410, 585 N.W.2d 445 (1998); *Schirber v. State*, 254 Neb. 1002, 581 N.W.2d 873 (1998). The rule applies, however, only when the party to litigation is seeking to recover attorney fees in the very case being litigated. See, *Zimmerman v. FirsTier Bank, supra*; *Tetherow v. Wolfe*, 223 Neb. 631, 392 N.W.2d 374 (1986).

In *Tetherow*, we held that the trial court correctly allowed as an item of the plaintiff's damages certain attorney fees which the plaintiff had incurred in defending an earlier legal action which were occasioned by the tort of the defendant. Thus, in *Tetherow*, the plaintiff vendor sued the defendant real estate broker for the broker's failure to properly prepare a real estate sale contract. We approved as an item of damages the attorney fees the vendor had expended defending a suit brought by the purchaser of the real estate to recover the downpayment. In support of our conclusion, we quoted the Restatement (Second) of Torts § 914(2) (1979), which states:

> "One who through the tort of another has been required to act in the protection of his interests by bringing or defending an action against a third person is entitled to recover reasonable compensation for loss of time, attorney fees and other expenditures thereby suffered or incurred in the earlier action."

*Tetherow*, 223 Neb. at 638, 392 N.W.2d at 379.

In response to Woollen's assignment of error, the State relies upon *Brochner v. Western Ins. Co.*, 724 P.2d 1293 (Colo. 1986). The *Brochner* court held that a primarily liable, joint tort-feasor was not obligated in a contribution action to pay the attorney fees and costs incurred by the secondarily liable tort-feasor, in defending the original action filed by the injured plaintiff. *Id.* *Brochner* is inapposite to the instant case. Woollen is seeking as an item of *damages* in the instant case, i.e., legal expenses he paid in prior proceedings brought as a result of medical fees he incurred for the treatment of injuries he sustained as a result of the accident, as distinguished from attorney fees incurred to determine liability in the instant case. In accordance with our analysis in *Tetherow, supra*, Woollen's legal costs are recoverable as an item of damages in the instant case.

The trial court struck this claim for damages, and the record contains no evidence concerning the amount of these attorney fees and expenses incurred by Woollen. Because we have concluded that Woollen established liability against the State, he is entitled to an award of damages including the reasonable amount of attorney fees and expenses suffered by him due to his defense of the prior medical claims, to the extent his evidence may establish those damages, reduced by the percentage of Woollen's comparative fault.

We reverse, and remand the cause for a damages trial limited to the presentation of evidence and a determination of the actual expenditures for reasonable attorney fees and other necessary costs directly arising out of Woollen's defense of the health care claims and, if damages are established, they are to be reduced by 40 percent, representing the percentage of negligence attributable to Woollen as determined in the first trial. See *Reiser v. Coburn*, 255 Neb. 655, 587 N.W.2d 336 (1998).

(b) Damages for Personal Property: Woollen's Vehicle

In his second assignment of error, Woollen claims the trial court erred in denying him recovery of damages for his vehicle, which Woollen claims was totally destroyed in the accident. In support of his damage claim, Woollen relies upon the following trial evidence: (1) photos of the automobile at the accident site,

(2) an accident report, and (3) Woollen's testimony that he purchased the car for $3,000 several weeks before the accident and that he had paid sales tax on the purchase. Woollen concedes on appeal that his evidence is "not as precise as it might have been." Brief for appellee at 25.

Under Nebraska law, the measure of recovery for damage to personal property that cannot be repaired and thereby restored to substantially its condition immediately before the damage occurred "is the lost market value plus the reasonable value of the loss of use of the property for the reasonable amount of time required to obtain a suitable replacement." *Chlopek v. Schmall*, 224 Neb. 78, 89, 396 N.W.2d 103, 110 (1986). In order to recover this "lost market value," a party must show

> (1) that the damage to the property is such that it cannot be repaired and thereby restored to substantially its condition immediately before the damage occurred or that the reasonable cost of repair exceeds the difference in market value of the property immediately before and immediately after the injury, (2) the reasonable market value of the property immediately before the accident, and (3) the reasonable market value of the property immediately after the accident.

*Howells Elevator v. Stanco Farm Supply Co.*, 235 Neb. 456, 463, 455 N.W.2d 777, 782 (1990). Compare NJI2d Civ. 4.20.

A review of the record shows that the proof of the vehicle's value before the accident is thin and that, other than photographs of the vehicle, there is no evidence of the vehicle's value after the accident. We find no error in the trial court's determination that absent evidence of the car's value after the accident, it could not award damages to Woollen for the loss of his vehicle. We affirm the decision of the trial court on this item of damages.

(c) Lost Earnings

The court found that as a result of the accident, Woollen had sustained lost income to the date of trial in the amount of $6,000 and a $30,000 loss of future earning capacity. Woollen claims as error the trial court's award of past and future loss of earning capacity.

With respect to an award of damages under the State Tort Claims Act, we recently stated that the determination of the amount of damages is "a matter which is one solely for the fact finder, whose action in this respect will not be disturbed on appeal if it is supported by evidence and bears a reasonable relationship to the elements of damages proved." *Talle v. Nebraska Dept. of Soc. Servs.*, 253 Neb. 823, 829, 572 N.W.2d 790, 796 (1998). In *Talle*, we held:

> An award of damages may be set aside as excessive or inadequate when, and not unless, it is so excessive or inadequate as to be the result of passion, prejudice, mistake, or some other means not apparent in the record. . . . If an award of damages shocks the conscience, it necessarily follows that the award was the result of passion, prejudice, mistake, or some other means not apparent in the record.

(Citation omitted.) *Id.*

At trial, Woollen's evidence regarding loss of earning capacity consisted generally of Woollen's testimony regarding expenses and income. Given the evidence adduced at the trial concerning Woollen's claimed loss of past and future earning capacity, we cannot say the district court's award is so inadequate as to shock the conscience. This assignment of error is without merit.

### (d) Contributory Negligence

Woollen's fourth and fifth assignments of error can be restated as one assignment of error: Woollen challenges the trial court's finding that he was contributorily negligent.

In our consideration of the State's appeal, we have addressed the trial court's determination concerning the parties' comparative negligence. The trial court found that Woollen was aware of water collecting on the highway and was driving on the outer edges of the ruts so as to avoid driving in the accumulated water. The court further found the pool of water was visible to drivers traveling west. The court did not determine whether Woollen saw the pool, but found he failed to maintain control of his vehicle and was traveling at an unsafe rate of speed for the conditions then and there existing. These findings are amply supported by the record. We determine that the trial court did

not err in finding that Woollen was contributorily negligent and that he was responsible for 40 percent of the negligence that proximately caused the accident. These assignments of error are, without merit.

### (e) Admission of Testimony of State's Expert on Causation

Woollen claims that the State's expert, Sicking, should not have been permitted to testify. Woollen's argument appears to be that Sicking's testimony did not agree with that of other witnesses and that it should, therefore, have been excluded. We do not agree.

The admission of expert testimony is ordinarily within the discretion of the trial court. *Childers v. Phelps County*, 252 Neb. 945, 568 N.W.2d 463 (1997). Here, Sicking indicated that his qualifications included a Ph.D. degree in civil engineering from Texas A&M University, 12 years of work with the Texas Transportation Institute researching roadside safety issues, and a position as the director of the Midwest Roadside Safety Facility, which conducts safety research and advises state highway departments on safety issues. Sicking testified that he has written over 100 publications, primarily in the area of roadside and roadway safety. He is a member of the American Society of Civil Engineers and the American Society of Mechanical Engineers, and he is an active participant on the Transportation Research Board. Sicking received the Federal Highway Administration Safety Award for his development of a roadside safety device. Sicking stated that he had reviewed the accident report, photos of the scene at the time of the accident, photos of the highway after the accident, photologs from the Nebraska Department of Roads photolog system, Woollen's deposition, witness statements, and climatological data in reaching his opinion. The record demonstrates that Sicking was qualified to render relevant expert testimony and had a basis for so doing. Woollen's complaint about Sicking goes to the weight to be accorded to Sicking's testimony, not its admissibility.

Our review of the record shows that the trial court did not err in admitting Sicking's testimony. This assignment of error is without merit.

## VI. CONCLUSION

The trial court found Woollen 40-percent negligent and the State 60-percent negligent for the injuries Woollen suffered in this one-car accident. With respect to the State's appeal, we affirm the trial court's finding as to the comparative negligence of the parties. With respect to the cross-appeal, we conclude the trial court erred in striking Woollen's damage claim for legal expenses he paid in proceedings prior to the trial herein that concerned medical bills incurred for the treatment of injuries he sustained in the accident. We reverse, and remand for a new trial in the trial court limited to Woollen's claim for damages in the instant action due to legal expenses incurred in prior proceedings, with directions that if such damages are established, such damages shall be reduced by 40 percent, representing the percentage of negligence attributable to Woollen as determined in the first trial. We conclude the remainder of the assigned errors in Woolen's cross-appeal are without merit.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED FOR A NEW TRIAL ON THE ISSUE OF DAMAGES.